# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

―――――――――――

Nº 03-CV-0870 (JFB) (AKT)

―――――――――――

REBECCA G. GENIA, HERMAN M. QUINN, AND GORDELL WRIGHT,

Plaintiffs,

VERSUS

NEW YORK STATE TROOPERS PARKER, GUSPARIK, SUMMERLIN, LIBERTI, AND LEWIS, AND JOHN DOES 1-10,

Defendants.

―――――――――――

MEMORANDUM AND ORDER
March 20, 2007

―――――――――――

JOSEPH F. BIANCO, District Judge:

Plaintiffs Rebecca G. Genia ("Genia"), Gordell Wright ("Wright"), and Herman M. Quinn ("Quinn") (collectively, "plaintiffs"), filed the instant action against New York State Troopers Parker ("Trooper Parker"), Gusparik ("Trooper Gusparik"), Summerlin ("Trooper Summerlin"), Liberti ("Trooper Liberti"), Sergeant Lewis ("Sergeant Lewis"), and John Does 1-10[1] (collectively,

"defendants"), pursuant to 42 U.S.C. § 1983, alleging false arrest, excessive force, malicious prosecution and improper search and seizure under the Fourth Amendment and suppression of plaintiffs' free speech rights under the First Amendment.[2]

―――――――――――

Doe defendants, and therefore dismisses plaintiffs' claims against John Does 1-10 without prejudice. *See Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 536 n.3 (S.D.N.Y. 2005).

[2] Plaintiffs specify in their moving papers the individual defendants against whom each of the individual plaintiffs' claims are brought: "Defendant Parker and Gasparik are charged as to Plaintiff QUINN; Defendants Summerlin and Liberti are charged as to the Plaintiff GENIA; and

―――――――――――

[1] Although discovery is now complete, plaintiffs have failed to serve or to identify the John Does listed as defendants in the Amended Complaint. The Court concludes that plaintiffs were provided with ample time to attempt to identify the John

Defendants now move, under Federal Rule of Civil Procedure 56, for summary judgment dismissing all of plaintiffs' claims. For the reasons that follow, defendants' motion is denied in part and granted in part.

## I. BACKGROUND

### A. The Facts

The following facts are taken from the parties' depositions, declarations, exhibits and respective Local 56.1 statements of facts.[3] Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Thus, with regard to defendants' motion for summary judgment, the Court shall construe the facts in favor of plaintiffs.

Plaintiffs Genia, Quinn, and Wright are tribal members of the Shinnecock Indian Nation. (Defs.' Rev. 56.1 at ¶ 1.) On the morning of February 24, 2000, plaintiffs Genia and Wright participated in a demonstration protesting the construction and development by private landowners on land that the demonstrators claimed to be ceremonial land of the Shinnecock Indian Nation.[4] (Defs.' Rev. 56.1 at ¶ 13.) The

demonstration took place at St. Andrew's Road, in the Town of Southampton, in Suffolk County, New York. (*Id.*) At approximately 8:05 a.m., Trooper Parker, who was serving on desk duty, received a telephone call regarding activity at the St. Andrew's site. (*Id.* at ¶ 14.) In response, Troopers Liberti, Summerlin and Gasparik were dispatched to the site.[5] (*Id.* at ¶ 15.) At 8:22 a.m., Sergeant Schultz called the New York State Police's Riverhead facility and requested more personnel. (*Id.* at ¶ 16.)

One month prior to the February 24, 2000 protest, there had been another protest at the St. Andrew's site, in which Wright, Genia and others were involved. (*Id.* at ¶ 92.) The protest resulted in the cessation of construction work because the developer did not have the necessary papers from the Town of Southampton. (*Id.*) According to Wright, after learning that the construction work had resumed a few days earlier, he went to the site at approximately 8:00 a.m. on February 24 to "see whether 'anything was changed' with respect to the developer's necessary papers, and to determine the legality of the developer's resumption of construction-related activities at the site." (Brewington Decl., Ex. G.) When Wright arrived at the site, approximately ten to fifteen Shinnecock tribal members and several construction workers were present. (*Id.*) Approximately five minutes later, Trooper Summerlin arrived

---

Defendants Liberti and Lewis are charged as to Plaintiff WRIGHT." (Pls.' Br., at 3.)

[3] Where one party's 56.1 statement is cited, the fact is not contested by the other party.

[4] According to plaintiffs, Quinn was not part of the protest, but arrived on the scene in his van and merely stopped to see the demonstration. (Pls.' 56.1 at ¶ 13.) Defendants assert that Quinn participated in the demonstration, along with the

other two plaintiffs. (Defs.' Rev. 56.1 at ¶ 13.)

[5] Plaintiffs claim that Sergeant Lewis and Zone Sergeant Schultz were not dispatched as a result of the call, but went to the site after speaking with Trooper Parker. (Pls.' 56.1 at ¶ 15.) Defendants assert that Sergeant Lewis was directed to go to the site following Trooper Parker's call. (Defs.' Rev. 56.1 at ¶ 15.)

at the site, and, according to Wright, approached the demonstrators and threatened to arrest them. (*Id.*) The demonstrators, including Wright, told Troopers Summerlin and Liberti that they wanted to see the developer's paperwork. (*Id.*) While the demonstrators and the troopers conversed, a bulldozer approached. (Defs.' Rev. 56.1 at ¶ 98.) The bulldozer stopped near the protestors, prompting a trooper to say "you got to get out of the way" and to tell Wright that he was being arrested for trespassing. (Brewington Decl., Ex. G.) Sergeant Lewis and Trooper Liberti handcuffed Wright and placed him under arrest. (Defs.' Rev. 56.1 at ¶ 104.)

Immediately before her arrest, Genia was standing on the shoulder of St. Andrew's Road, facing the road, as a construction bulldozer approached her and the other demonstrators. (*Id.* at ¶ 46.) The bulldozer stopped within ten feet of Genia. (Brewington Decl., Ex. F.) According to Genia, Trooper Summerlin, who was standing in front of Genia, cursed at her and pushed her. (*Id.*) Along with Trooper Liberti and Sergeant Schultz, Trooper Summerlin then brought Genia over to a car and rear-handcuffed her. (*Id.*) Troopers Summerlin and Liberti also escorted Genia to a New York State Police ("NYSP") car and put her inside. (Defs.' Rev. 56.1 at ¶ 52.) While she was being escorted to the car, Trooper Liberti allegedly twisted Genia's handcuffs, and Genia told him "you're hurting me." (Brewington Decl., Ex. F.)

Between 9:00 a.m. and 10:00 a.m., after Genia and Wright had already been arrested and were driven away from the demonstration site by NYSP troopers, Quinn was driving his van on St. Andrew's Road and came upon the demonstrators. (Defs.' Rev. 56.1 at ¶ 57, 69.)

He stopped his van and got out of the vehicle. (*Id.*) Trooper Gasparik approached Quinn and told him that he had to move his van. (*Id.* at ¶ 73.) In response, Quinn told Trooper Gasparik that he was tying his shoe. (Brewington Decl., Ex. H.) Trooper Parker then approached Quinn from the rear and asked him whether he was trying to be funny, and whether he wanted to be arrested or locked up. (*Id.*) Trooper Parker handcuffed Quinn and placed him in an NYSP car. (Defs.' Rev. 56.1 at ¶¶ 78, 82.)

The arrests and handcuffings were recorded by a video camera operated automatically from a NYSP car at the site.[6] (*Id.*) Each plaintiff was placed in a NYSP car and driven from the site of the demonstration to NYSP's facility in Riverhead, New York, for processing. (*Id.* at ¶ 22.) At the Riverhead facility, Trooper Summerlin spoke with each plaintiff and processed the relevant paperwork. (*Id.* at ¶ 23.) Trooper Summerlin then drove the plaintiffs to Southampton Town Court to be arraigned. (*Id.* at ¶ 24.)

Genia and Wright were each charged with disorderly conduct and resisting arrest in violation of New York Penal Laws §§ 240.20 and 205.30 in criminal informations signed by Troopers Summerlin and Liberti, respectively. (*Id.* at ¶ 25.) Quinn was charged with disorderly conduct in violation of New York Penal Law §240.20(5) and parking on a roadway in violation of New York Vehicle and Traffic Law §1201(a). (Brewington Decl., Ex. A.) On October 5, 2001, Southampton Town Justice Thomas J. DeMayo dismissed the resisting arrest charges against Genia and Wright as facially

---

[6] The videotape was submitted to this Court as Exhibit O to the Brewington Declaration.

insufficient. (Defs.' Rev. 56.1 at ¶¶ 33, 60; Brewington Decl., Ex. B.) On October 12, 2001, the Suffolk County District Attorney's Office (hereinafter the "D.A.") faxed proposed changes to the charging informations from Troopers Summerlin and Liberti in order to reinstate the resisting arrest charges. (Defs.' Rev. 56.1 at ¶¶ 33, 60.) Trooper Liberti's superior directed him to "call the ADA & get this done asap." (*Id.* at ¶ 61.) As Trooper Summerlin had retired from the New York State Police earlier that year, Trooper Liberti brought the amended information as to Genia to Trooper Summerlin's home, where he signed it. (*Id.* at ¶ 62.) On December 18, 2001, the D.A. recharged plaintiffs with resisting arrest. (*Id.* at ¶ 34.) After a criminal trial, a jury found Genia and Wright not guilty, and all charges against them were dismissed. (*Id.* at ¶ 27; Brewington Decl., Ex. A.) The charges against Quinn were dismissed prior to submission of the case to the jury. (Defs.' Rev. 56.1 at ¶ 27.)

### B. Procedural History

On February 21, 2003, plaintiffs filed the instant action, which originally named the State of New York and the New York State Police Department as parties. On March 31, 2003, plaintiffs amended their complaint, naming only the individual state troopers as defendants and asserting claims under 42 U.S.C. § 1983 and the First, Fourth, Fifth,[7]

Eighth[8] and Fourteenth Amendments, for improper search and seizure, false arrest, malicious prosecution, excessive force, and violations of plaintiffs' free speech rights.

On September 19, 2006, defendants moved for summary judgment on all claims. This case was reassigned to the undersigned on October 2, 2006. Oral argument was held on February 21, 2007.

## II. DISCUSSION

### A. Standard of Review

The standards for summary judgment are well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility

---

[7] At oral argument, plaintiffs' counsel explained that plaintiffs only maintain a Fifth Amendment claim inasmuch as the Fifth Amendment is related to the Fourteenth Amendment. As they bring no specific claims under § 1983 pursuant to the Fifth Amendment, summary judgment is granted on any such claim.

[8] While plaintiffs' complaint asserts an Eighth Amendment claim, this claim was not addressed in the parties' briefing, and at oral argument, plaintiffs' counsel confirmed that plaintiffs do not wish to pursue any Eighth Amendment claim. Therefore, this claim shall be treated as abandoned.

assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

### B. Plaintiffs' Claims Under 42 U.S.C. § 1983

To prevail on a claim under section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress of the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). "Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (false arrest) and citing *Conway v. Village of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984) (malicious prosecution)).

### 1. False Arrest / False Imprisonment[9]

The Second Circuit has established that "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under Section 1983." *Weyant*, 101 F.3d at 852 (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) and citing *Broughton v. State*, 37 N.Y.2d 451, 458 (N.Y. 1975)

---

[9] "A claim for false arrest is a type of claim for false imprisonment." *Coyle v. Coyle*, 354 F. Supp. 2d 207, 211 (E.D.N.Y. 2005) (citing *Weyant*, 101 F.3d at 853).

(holding that, under New York law, "[j]ustification may be established by showing that the arrest was based on probable cause") and *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.")). In general, probable cause is established where "the arresting officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'"[10] *Singer*, 63 F.3d at 119 (quoting *O'Neill v. Town of Babylon*, 986 F.2d 646, 650 (2d Cir. 1993) (citation omitted)); *See also Weyant*, 101 F.3d at 852 (citing *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979)) (additional citations omitted). Furthermore, "the validity of an arrest does not depend upon an ultimate finding of guilt or innocence." *Peterson v. Cty. of Nassau*, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967)). "Rather, the court looks only to the information the arresting officer had at the time of the arrest." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Moreover, a determination of probable cause is based upon the "totality of the circumstances, [and] 'where law enforcement authorities are cooperating in an investigation . . ., the knowledge of one is presumed shared by all.'" *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989) (quoting Illinois v. Andreas, 463 U.S. 765, 771 n.5 (1983)) (additional citations omitted); *see also Bernard*, 25 F.3d at 102 (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1982)). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute." *Weyant*, 101 F.3d at 852 (citations omitted). Where an issue of probable cause is "factual in nature," it must be presented to a jury. *Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994) (citations omitted).

Moreover, an officer who merely observes or assists in an arrest, even if he is not the "arresting officer" may be liable for failing to intercede to prevent an arrest without probable cause.[11] *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.") (citations omitted).

---

[10] In New York State, "a police officer may arrest a person for . . . a crime when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise." N.Y. Crim. Proc. Law § 140.10(1)(b). "'Reasonable cause to believe that a person has committed an offense' exists when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it." N.Y. Crim. Proc. Law § 70.10.

[11] Therefore, defendants' assertions that Lewis was the "arresting officer" for plaintiff Wright, and that "Trooper Liberti (not Sgt. Lewis) is listed as the arresting officer on the NYSP's arrest report with respect to Wright [], because NYSP sergeants and those holding higher ranks do not receive credit for arrests," are of no import with regard to Wright's false arrest claim. Regardless of which officer was the actual arresting officer, neither Liberti nor Lewis is entitled to summary judgment because the disputed issues of fact in this case are sufficient to require a jury to decide whether the non-arresting officer should be liable under a failure to intercede theory.

According to defendants, Troopers Summerlin, Lewis and Liberti had probable cause to arrest Genia and Wright: (1) for trespassing, as the Shinnecock demonstrators had not proven title to the land on which they were demonstrating, nor had they shown proof of a valid stay of the construction;[12] and (2) for disorderly conduct, as both Genia and Wright had allegedly blocked traffic by stopping a bulldozer from entering the construction site.[13] (Defs.' Br., at 8-9.) Defendants assert that Troopers Gasparik and Parker had probable cause to arrest Quinn for violating New York Vehicle and Traffic Law

§ 1201(a), because he parked his van in a manner that blocked traffic on St. Andrew's Road. (Defs.' Br., at 9-10.)

a. Probable Cause to Arrest Genia

(1) Trespassing

N.Y. Penal Law § 140.05 provides that: "[a] person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises. Trespass is a violation." Under N.Y. Penal Law § 140.00, a person cannot trespass upon premises that are "open to the public" unless "he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person." The determination of whether premises are "open to the public" is "usually a question of fact." *Davis v. City of New York*, 373 F. Supp. 2d 322, 332 (S.D.N.Y. 2005) (collecting New York state cases).

First, it is contested whether or not Genia was standing on the actual construction site, which may or may not have been open to the public. The videotape is inconclusive as to exactly where Genia was standing just prior to her arrest. (Brewington Decl., Ex. O.) According to Genia, she was standing on the shoulder of St. Andrew's Road, facing the road, with her back to the construction site. (Brewington Decl., Ex. F.) In fact, Trooper Summerlin stated that when he handcuffed Genia, she was actually standing on the road, rather than on the contested property. (Brewington Decl., Ex. N.) Likewise, Trooper Liberti, who assisted with Genia's arrest, stated in his deposition testimony that just prior to arrest, Genia had been standing in the road, "against the troop car." (Brewington Decl., Ex. J.) At trial, Reverend Holly Davis ("Davis"), one of the protestors, asserted that

---

[12] The fact that neither Genia nor Wright were actually arrested for trespassing does not affect the probable cause inquiry: "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (holding that the probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause)).

[13] Defendants contend that the troopers had probable cause to arrest based upon a call from the developer to the police station expressing concern that the demonstration might involve disorderly conduct. (Defs.' Br., at 6.) However, while "[w]hen information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity," *Curley*, 268 F.3d at 70, there is no indication in this instance that the developer actually was a victim of any criminal activity on the part of the demonstrators when he called the station, nor that the individual who called was an eyewitness who had observed criminal activity by Genia or Wright. Standing alone, such concerns are insufficient to establish probable cause.

during Genia's arrest, Trooper Summerlin told Davis that Genia was being arrested for trespassing. (Brewington Decl., Ex. N.) Davis responded "I watched you arrest her on the double yellow line, that's not trespassing." (*Id.*) Similarly, Elizabeth Haile ("Haile"), a member of the Shinnecock Nation, testified that she saw Genia being "pulled toward the double yellow line in the middle of the street," and stated "[y]ou can't be arrested in the middle of the street, she is not doing anything." (*Id.*) Based upon these statements, a reasonable jury could conclude that Genia was not standing on the construction site. As plaintiffs have created a material question of fact as to where Genia was standing prior to her arrest, this Court cannot conclude as a matter of law that Trooper Summerlin had probable cause to arrest Genia for "knowingly enter[ing] or remaining unlawfully . . . upon premises." N.Y. Penal Law § 140.05.

Second, it cannot be determined as a matter of law that during the demonstration, Genia was standing upon premises that were not "open to the public," or that, if open to the public, she defied an order by an "owner or authorized person" not to enter or to remain there. N. Y. Penal Law § 140.05. Genia testified that the foreman was given the opportunity to ask the protestors to leave, and declined to do so. At her deposition, Genia stated that Trooper Summerlin had approached the foreman and asked "did you tell them to leave?" When the foreman responded "no," Trooper Summerlin said "you have to tell them to leave if you want me to arrest them." (Brewington Decl., Ex. F.) Genia did not recall whether the foreman responded, and, if so, what he said. (*Id.*) There is no indication that, once prompted by Trooper Summerlin, the foreman ordered the protestors to leave the property. In addition, Genia testified that at least one authority figure, a representative of the Department of Transportation, had informed her and other demonstrators that they "were standing on public property." (*Id.*) In Wright's deposition testimony, he corroborated Genia's account that the demonstrators had been told that they were lawfully conducting their protest in an area that was "open to the public," stating

> We had asked what was public land where, [sic] are you allowed to stand, and he told us on the side of the road. They showed us where the strip was where we were allowed to stand and we were standing there. It wasn't in the street, it was on the side, the shoulder, the grassy area.[14]

(Brewington Decl., Ex. G.) Reuben Valdez ("Valdez"), a Shinnecock demonstrator, stated that at one point during the protest, a member of the public from the nearby "Greek Church neighborhood" walked his dog through the property. (Brewington Decl., Ex. N.) When Valdez pointed the individual out to the police officers and asked "isn't he trespassing?," the troopers did nothing. (*Id.*) Moreover, at trial, several troopers testified that they had not ordered the demonstrators to leave the premises, but had merely informed them that they were not to block the entrance to the construction site.[15] Trooper Lewis testified

---

[14] Wright could not recall who had pointed out where the demonstrators were permitted to stand. (Brewington Decl., Ex. G.)

[15] At trial, plaintiff's counsel declared that, in a written statement by ADA Keith O'Halleran on February 20, 2002, ADA O'Halleran stated that the police had been called to the demonstration site to remove trespassers. (Brewington Decl., Ex. N.) However, none of the troopers, except for Summerlin, had any knowledge of that order or

that he had explained to the protestors that "there was no problem with a peaceful protest as long as access to the construction site wasn't blocked." (Brewington Decl., Ex. N.) Similarly, Sergeant Schultz advised the demonstrators that "they could conduct a peaceful demonstration, but they could not block the highway or the entrance of the construction site." (*Id.*) According to Trooper Summerlin, when he first approached Genia at the demonstration site, he merely stated that she "was not to impede any traffic" and made no mention of trespassing. (*Id.*)

Because there are material questions of fact as to (1) whether Genia was standing on the contested property or was in the road; and (2) whether Genia stood in an area that was "open to the public," and if so, whether she defied any order from an "authorized person" to leave, this Court cannot find as a matter of law that Trooper Summerlin had probable cause to arrest Genia for trespassing.

(2) Disorderly Conduct

Defendants also argue that Trooper Summerlin had probable cause to arrest Genia for violating N.Y. Penal Law § 240.20(5), which defines disorderly conduct as follows: "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," "[h]e obstructs vehicular or pedestrian traffic." N.Y. Penal Law § 240.20. According to the police report, Genia "did obstruct vehicular traffic by standing in the path of a construction vehicle and remaining in path after being ordered to move by law enforcement personnel." (Brewington Decl., Ex. C.)

According to Trooper Summerlin, he had advised Genia that she could not obstruct the flow of traffic entering and leaving the construction site. (Brewington Decl., Ex. I.) At trial, Trooper Summerlin testified that, just before her arrest, the engine of the bulldozer had started, and Genia "screamed 'no' and started running toward the bulldozer as it was attempting to enter the property." (Brewington Decl., Ex. N.) According to Trooper Summerlin, he and Trooper Liberti then tried to restrain Genia and handcuffed her. (*Id.*) Trooper Summerlin explained that he had arrested Genia for "screaming" and "preventing the truck from coming and driving onto the Parish Pond project property." (*Id.*) Sergeant Schultz also testified that Genia "was blocking the entrance and would not allow the heavy equipment to enter on to the construction site." (*Id.*) Valdez described Genia as "standing in the road, shoulder to shoulder, in a line" with other demonstrators, when "they drove the equipment right up inches" from the line of people. (*Id.*) However, Genia testified that when the bulldozer began to approach the site, she was standing on the shoulder of St. Andrew's Road, engaged in a conversation with Trooper Lewis, the construction foreman and a representative from the Department of Transportation. (Brewington Decl., Ex. F.) The bulldozer continued to approach Genia until it came to a stop approximately ten feet from where she stood. (*Id.*) Similarly, Wright explained that he and Genia had been engaged in a dialogue with several troopers and trial members when the bulldozers began to approach them. (Brewington Decl., Ex. N.) According to Wright, while they were still in

_____

any similar instructions. (*Id.*) According to Summerlin, "[i]t was explained to us [troopers] that if [the demonstrators] were to remain on the property or at the entrance, they would be arrested for trespassing." (*Id.*)

conversation, the bulldozer stopped, and a trooper said "[y]ou got to get out of the way," before telling Genia and Wright that they were under arrest for trespassing. (*Id.*)

Based upon the factual record before the Court, there are disputed issues of fact as to whether Genia obstructed traffic by blocking the path of the bulldozer. Due to obstructions and the distance of the camera from the demonstrators, the videotape does not clearly indicate whether Genia blocked the bulldozer. (Brewington Decl., Ex. O.) According to some of the trial and deposition testimony, *see supra*, Genia was standing in the middle of the road, rather than at the entrance to the construction site. The conflicting accounts of where Genia was located at the time of her arrest indicate that there are questions of fact as to whether defendants had probable cause to arrest Genia for disorderly conduct.

Moreover, even if Genia did block the bulldozer's access to the construction site, there are also disputed issues of fact as to whether she acted with "intent to cause public inconvenience, annoyance or alarm" or "recklessly created a risk thereof" as required by the disorderly conduct statute. N.Y. Penal Law § 240.20. By Genia's own account, she was talking with the troopers, other protestors, and a DOT representative at the time that the bulldozer approached.[16] Considering that the

officers were aware of the circumstances underlying Genia's behavior, which Genia contends show an absence of intent to cause "public inconvenience, annoyance or alarm," a jury must decide whether the officers had probable cause to arrest her with regard to the intent element of the disorderly conduct statute.

Therefore, this Court cannot conclude, as a matter of law, that defendants Summerlin and Liberti had probable cause to arrest plaintiff Genia, either for trespassing or disorderly conduct.

### b. Probable Cause to Arrest Wright

#### (1) Trespassing

According to defendants, Troopers Lewis and Liberti had probable cause to arrest Wright for trespassing and disorderly conduct. (Defs.' Br., at 8-9.) For the same reasons that this Court finds that it cannot determine, as a matter of law, that defendants had probable cause to arrest Genia for trespassing, the Court finds that there are issues of fact precluding summary judgment on whether there was probable cause to arrest Wright for trespassing.

First, as in the case of Genia, there is a question of fact as to whether Wright was actually standing on the contested property. Wright testified at his deposition that prior to his arrest, he had been standing on the side of the road in a grassy area designated as "public" land (described *supra*, in Part B(a)(1)). (Brewington Decl., Ex. G.) According to Wright, he had been standing

---

[16] When asked whether she was trying to stop the bulldozer at that time, Genia stated "[w]e had been trying to stop the bulldozer for the last 30 days." (Brewington Decl., Ex. F.) However, this statement by Genia is not sufficient to eliminate a disputed issue of fact on intent, given the other evidence in the record. Although the comment supports defendants' position that Genia intended to block the path of the bulldozer, it could also be interpreted by a factfinder as

referring to Genia's long-term goals with regard to the protest, rather than an immediate attempt to keep the bulldozer from entering the property.

"[o]n that piece where they said we were allowed to stand" when his arms were "grabbed" by Trooper Lewis. (Brewington Decl., Ex. G.) Haile corroborated this account, stating that just prior to his arrest, Wright had been standing "on the other side of the street [from Haile], and he was standing just the way we were told to stand." (Brewington Decl., Ex. N.) According to Trooper Lewis, at the time of Wright's arrest, he was "in the roadway," "standing on the pavement," rather than on the construction site. (Brewington Decl., Ex. N.) Sergeant Schultz described Wright as "refus[ing] to move out of the way to allow . . . the construction equipment on the sites," but did not state whether he was standing on the premises, in the road, or in a specially designated "public" area in a grassy portion of the shoulder of the road. (Brewington Decl., Ex. N.)

Second, there are material questions of fact as to whether Wright was standing in an area that was "open to the public" or whether he defied a lawful order to leave or not to remain in such public area. *See supra.*

### (2) Disorderly Conduct

Likewise, the Court finds that there are questions of fact with regard to whether defendants Lewis and Liberti had probable cause to arrest Wright for disorderly conduct. As in the case of Genia, the videotape is inconclusive as to where Wright was standing and whether he blocked the path of the bulldozer. (Brewington Decl., Ex. O.) According to Trooper Lewis, the arresting officer, Wright "was standing in the roadway in front of the access point facing the construction equipment with his arms crossed." (Brewington Decl., Ex. N) Similarly, Sergeant Schultz testified that

Wright "placed himself in the front of the piece of heavy equipment that was trying to come down and enter the construction site. He stood in front, folded his hands across his chest, and refused to move out of the way to allow this construction equipment on the sites." (Brewington Decl., Ex. N.) Trooper Lewis told Wright to move out of the path of approaching vehicles. (Brewington Decl., Ex. L.) According to Trooper Lewis, he provided Wright with an opportunity to comply with the order, and Wright failed to do so. (*Id.*) However, at trial, Wright testified that he "wasn't standing in the road blocking the bulldozer," but was "having a conversation with the State Trooper, and that is when the bulldozer came to us." (Brewington Decl., Ex. N.) Upon further questioning by the court, Wright explained "as the conversation was going on between us and State Troopers, the bulldozer came out into the road and came right in front of me." (*Id.*) When he finally received orders from the troopers to move, the instructions were issued simultaneously with physical force: "they told us to get out of the way, and at the same time they pushed us out the way. So, they didn't really give us a whole lot of time." (*Id.*) Davis, who witnessed Wright's arrest, stated that she did not see him standing in front of the bulldozer. (*Id.*) This conflicting testimony indicates that there are questions of material fact as to where Wright was standing, whether he blocked the bulldozer's access, and whether he defied an order to move out of the way of the bulldozer.

Moreover, as in the case of Genia, defendants have not shown an absence of a triable issue of fact as to whether Wright acted with the requisite intent to violate § 240.20. Like Genia, Wright contends that at the time the bulldozer approached, he was engaged in conversation with several troopers and protestors, and was not acting to block the

path of the bulldozer. (Brewington Decl., Ex. G.) "The question, then, is whether 'no reasonable jury could fail to find that [Troopers Lewis and Liberti] had probable cause to believe that [Wright] acted with wrongful intent.'" *Provost*, 262 F.3d at 158 (quoting *Gagnon v. Ball*, 696 F.2d 17, 20 (2d Cir. 1982)). If Wright's version is credited, the Court concludes that a reasonable jury could, in fact, find that the troopers lacked probable cause to believe that Wright acted with wrongful intent.

Therefore, the Court cannot find, as a matter of law, that Troopers Lewis and Liberti had probable cause to arrest Wright for trespassing or for disorderly conduct.

### c. Probable Cause to Arrest Quinn

According to Trooper Parker, during the demonstration, Quinn pulled up to the construction site in his van, then "stopped in the roadway," exited his car, and began talking to some of the demonstrators. (Brewington Decl., Ex. K.) Trooper Parker stated that he repeatedly asked Quinn to move his van, finally telling him "if he didn't move it, he would be arrested." (*Id.*) When Quinn "ignored" him, Trooper Parker placed Quinn under arrest. (*Id.*) Trooper Parker stated that Trooper Gasparik had also asked Quinn to move his van, and that Quinn was provided with an opportunity to do so, although he could not recall the specific amount of time given by Trooper Gasparik. (*Id.*) At trial, Trooper Parker stated that the van "was blocking traffic" and that it was not appropriate for Quinn to "stop the vehicle" in the center of the road. (Brewington Decl., Ex. N.) Trooper Lewis also stated in his deposition testimony that Quinn's vehicle was "blocking the roadway" and that "[h]e was physically parked in such a manner as to block the roadway." (Brewington Decl., Ex. L.) Trooper Gasparik testified that Quinn had "pulled up in the road and parked his vehicle in the northbound lane and just left it there" and stated that Quinn had "stopped right in the center of the lane."[17] (Brewington Decl., Ex. M.) The two-way road had only one lane in each direction. (Brewington Decl., Ex. O.) According to Trooper Gasparik, he repeatedly asked Quinn to move his van from the roadway, but Quinn ignored his instructions. (Brewington Decl., Ex. M.) At one point, Trooper Gasparik stated, Quinn bent down to tie his shoes and said "I'm not moving my vehicle," then continued to ignore Troopers Gasparik and Parker, and "acted like [they] weren't there." (*Id.*) At that point, Trooper Gasparik testified, Trooper Parker placed Quinn under arrest. (*Id.*)

Quinn's account of the incident differs slightly from that of the troopers. Quinn testified that on the morning of the demonstration, he was driving along St. Andrew's Road, and stopped his car at the construction site after noticing several people standing in the road. (Brewington Decl., Ex. H.) At trial, Quinn stated that his van was "half on the shoulder" and that he had parked there because there were people "walking back and forth in the road." (Brewington Decl., Ex. N.) He conceded that if a car had come behind his vehicle, it could have passed only by driving "mostly" in the lane for oncoming traffic. (*Id.*) Quinn stated that after he got out of his car and began speaking to people, Trooper Gasparik approached him and said "you got to move your van." (Brewington Decl., Ex. H.) According to Quinn, he responded to Trooper Gasparik by

---

[17] At trial, Trooper Gasparik mistakenly identified Wright as the driver of the vehicle. (Brewington Decl., Ex. N.)

stating that he was tying his shoe. (*Id.*) Quinn testified that, after a few moments, Trooper Parker "came up behind [him] and said, are you trying to be funny, do you want to get locked up?" (*Id.*) Trooper Parker then handcuffed Quinn immediately. (*Id.*) Similarly, Haile testified that after Quinn parked and got out of the van, he knelt to tie his shoe, and the police officers said "hurry up," to which Quinn responded, "[j]ust a minute, I have to tie my shoe," after which he was arrested. (Brewington Decl., Ex. N.) Another witness, Winona Warren ("Warren"), stated at trial that Quinn had been parked "mostly" on the shoulder of the road, and that Quinn never stated "I am going to move it when I get ready." (*Id.*) Launcelot Gumbs, who also witnessed Quinn's arrest, stated that, although Quinn's van was "partially in the road," Quinn was "attempting to move his van" but was not given an opportunity to do so by the arresting officers. (*Id.*)

The undisputed evidence in this case establishes that Troopers Gasparik and Parker had probable cause to arrest Quinn for his failure to comply with New York Vehicle and Traffic Law §1201(a), which provides that:

> Upon any highway outside of a business or residence district no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or main-traveled part of the highway when it is practicable to stop, park, or so leave such vehicle off such part of said highway, but in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicles shall be available from a distance of two hundred feet in each direction upon such highway.

N.Y. C.L.S. Veh. & Tr. § 1201(a). It is incontrovertible from the videotape that Quinn's vehicle was stopped in the middle of the roadway, and that cars approaching from behind him would have had to pass into the left lane in order to continue north on St. Andrew's Road. (Brewington Decl., Ex. O.) In fact, as noted above, Quinn testified that, if a car came behind his vehicle, it could have passed him only by driving "mostly" in the lane for oncoming traffic. (Brewington Decl., Ex. N.) Based upon these circumstances, as a matter of law, Troopers Gasparik and Parker had probable cause to believe that Quinn had violated Section 1201(a), and thus to arrest him.[18] *See, e.g., Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Accordingly, Quinn's false arrest claim must be dismissed.

### 2. Malicious Prosecution

"'Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 U.S.C. § 1988 to turn to state law . . . for such rules.'" *Alicea v. City of New York*, No. 04-

---

[18] Even if a jury could conclude that there was no probable cause to arrest Quinn, it is apparent that police officers of reasonable competence could disagree as to whether Quinn was in violation of N.Y. Veh. & Tr. Law § 1201(a), thus establishing arguable probable cause for his arrest. Therefore, Quinn's claim of false arrest is dismissed, in any case, based upon the defense of qualified immunity.

CV-1243 (RMB), 2005 U.S. Dist. LEXIS 28129, at *17 (S.D.N.Y. Nov. 15, 2005) (quoting *Conway v. Mt. Kisco*, 750 F.2d 205, 214 (2d Cir. 1984)). "A malicious prosecution claim under New York law requires the plaintiff to prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Jocks*, 316 F.3d at 136 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (internal quotation marks omitted)). In addition to the required state law elements, "to sustain a § 1983 malicious prosecution claim, there must be a seizure or other 'perversion of proper legal procedures' implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (quoting *Singer*, 63 F.3d at 117). Defendants contest the third element of plaintiffs' malicious prosecution claim, probable cause, as well as the additional requirement under section 1983 that a plaintiff prove a post-arraignment deprivation of liberty.

First, the existence of probable cause to prosecute entitles the defendant to summary judgment in his favor. *Williams v. City of New York*, No. 20 Civ. 3693 (CBM), 2003 U.S. Dist. LEXIS 19078, at *16 (S.D.N.Y. Oct. 23, 2003). In the context of a malicious prosecution claim, probable cause is "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Rounseville v. Zahl*, 13 F.3d 625, 629-30 (2d Cir. 1994) (internal citations and quotation marks omitted). Thus, the Court must consider whether Troopers

Summerlin and Liberti had probable cause to charge Genia and Wright with disorderly conduct and resisting arrest,[19] and whether Trooper Parker had probable cause to charge Quinn with disorderly conduct and improperly parking on a roadway.[20]

a. Probable Cause to Prosecute Genia

As discussed *supra*, there are material questions of fact as to whether the officers had probable cause to arrest Genia for disorderly conduct. Similarly, because there were no intervening facts as to probable cause that arose between arrest and prosecution, the Court also declines to find, as a matter of law, that there was probable cause to prosecute her on this charge.

With regard to the resisting arrest charge, Trooper Summerlin testified at trial that he and Genia "were struggling" at the demonstration site, while Trooper Liberti

---

[19] The original accusatory instruments against Genia and Wright, charging them with resisting arrest, were dismissed as insufficient as a matter of law. After the D.A. conferred with Troopers Summerlin and Liberti and drafted new accusatory instruments that were signed by the troopers, the charges were reinstated. (Defs.' Rev. 56.1 at ¶¶ 58-62.)

[20] It appears from Trooper Parker's deposition that he signed the charging information against Quinn:

Q: With respect to Mr. Quinn's arrest, did you process the paperwork on his arrest?
A: I signed it. I read it and signed it.
Q: Who produced the paperwork?
A: Trooper Liberti brought it back to the scene so I can read it.

(Brewington Decl., Ex. K.)

stated that he "observed [Genia] resist having the handcuffs put[] on, flailing her arms around, kicking Trooper Summerlin." (Brewington Decl., Ex. N.) However, Genia claims that she did absolutely nothing to resist arrest. According to Genia, she was "shoved" by Trooper Summerlin, who then handcuffed her against the hood of a car and, along with Trooper Liberti, escorted her to another police cruiser and put her inside. (Brewington Decl., Ex. F.) At her deposition, Genia testified that she did not recall "squirming" or making any gestures towards the officers during her arrest. (*Id.*) Under Genia's account of the events, namely, that she did nothing to resist arrest, probable cause on the resisting arrest charge was completely lacking. Therefore, her version of events, although disputed by defendants, raises an issue of fact as to whether probable cause existed, and thus precludes summary judgment.

b. Probable Cause to Prosecute Wright

As discussed *supra*, there are material questions of fact as to whether the officers had probable cause to arrest Wright for disorderly conduct. Similarly, because there were no intervening facts as to probable cause that arose between arrest and prosecution, the Court also declines to find, as a matter of law, that there was probable cause to prosecute Wright for this charge.

With regard to the resisting arrest charge, Trooper Lewis testified at trial that Wright resisted arrest by refusing to be handcuffed:

Mr. Wright resisted my putting his hand behind his back. I had to forcibly bring it behind his back. I got a cuff – a handcuff on that hand behind his back, and when I attempted to reach around and grab his left arm,

Mr. Wright was waving it around, he wouldn't let me – wouldn't let me grab his arm. I was trying to bring it back and cuff it with the other handcuff.

(Brewington Decl., Ex. N.) Similarly, Trooper Liberti testified that Wright "was resisting being arrested, he was flailing his arms around." (*Id.*) However, Wright contends that he was merely turning his body in order to see the commotion that was taking place, and that Trooper Lewis gave him a warning about resisting arrest, which Wright obeyed:

I didn't resist or fight him or anything like that. But, because I turned around to see what was going on, he said 'If you give me any trouble, any problems, I will also charge you for resisting arrest.

(*Id.*) Wright claims that he did nothing to resist arrest. (*Id.*) Based upon Wright's account of the events, and viewing the facts in the light most favorable to him, there was no basis for a resisting arrest charge. Therefore, his version of events, although disputed by defendants, raises an issue of fact as to whether probable cause existed, and thus precludes summary judgment.

c. Probable Cause to Prosecute Quinn

As explained *supra*, there was probable cause to arrest Quinn for illegally parking on a roadway in violation of N.Y. Veh. & Tr. Law § 1201(a). Likewise, as no additional facts were uncovered after arrest regarding probable cause, Trooper Parker also had probable cause to prosecute Quinn for

violating this statute.[21] Therefore, the malicious prosecution claim on that charge must be dismissed.[22]

---

[21] It is well-settled that

> If there was probable cause to arrest the plaintiff, . . . then the same probable cause "is a bar to claims of malicious prosecution directed at the arresting officer under § 1983 . . . unless that officer, following the arrest but prior to initiating prosecution, learned of facts that would negate his earlier determination of probable cause."

*Joyner v. Morales*, No. 04-CV-569 (AKH), 2005 WL 883327, at *4 (S.D.N.Y. April 15, 2005) (quoting *Moscoso v. City of New York*, 92 F. Supp. 2d 310, 313 (2000)).

[22] In contrast to the analysis of false arrest claims, discussed *supra*, the Second Circuit has noted that a conviction on one claim does not necessarily absolve liability under § 1983 for malicious prosecution as to other criminal charges which were resolved favorably to plaintiff. *See Janetka v. Dabe*, 892 F.2d 187, 190 (2d Cir. 1989) (claim of malicious prosecution on charge of resisting arrest, of which plaintiff was acquitted, was not barred by his conviction for disorderly conduct); *see also Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991) (highlighting "the need to separately analyze the charges claimed to have been maliciously prosecuted"). Thus, for the same reasons in this case, a probable cause determination as to a Section 1201(a) violation does not necessarily bar a malicious prosecution claim on the disorderly conduct charge; rather, the Court should analyze a number of factors, including the relative seriousness of the two offenses "whether the elements of each charge are different, whether one charge is a lesser included offense of the other, and whether the alleged actions were directed at different people." *Pichardo v. N.Y. Police Dep't.*, No. 98-CV-429 (DLC), 1998 WL 812049, at *3 (S.D.N.Y. Nov.

With regard to the disorderly conduct charge under Section 5 of the N.Y. Penal Law § 240.20, which prohibits "obstruct[ing] vehicular or pedestrian traffic," several facts are undisputed and, in any case, are evident from the videotape. Quinn's vehicle was illegally parked in the middle of the road. Any oncoming vehicles would have had to pass into the lane for oncoming traffic, where several demonstrators and troopers were standing. Furthermore, it is also undisputed that at least one trooper repeatedly asked Quinn to move his vehicle. In response, Quinn began to tie his shoes rather than to comply immediately with the orders to move his van. Thus, the undisputed evidence of Quinn's actions provides probable cause to believe that he recklessly created a risk of "public inconvenience, annoyance or alarm" sufficient to satisfy the intent requirement of the disorderly conduct statute. N.Y. Penal Law § 240.20. Under the circumstances, prosecuting Quinn for disorderly conduct was fully in accordance with the public aim of the statute in addressing "'situations that carr[y] beyond the concern of individual disputants to a point where they . . . become a potential or immediate public problem.'" *Provost*, 262

---

18, 1998) (citing *Janetka*, 892 F.2d at 190); *see also Ostroski v. Town of Southold*, 443 F. Supp.2d 325, 335-40 (E.D.N.Y. 2006) (discussing factors). Analyzing the various factors in the instant case – including that both crimes (*i.e.*, Section 1201(a) and disorderly conduct) are violations (and thus are of equal seriousness), and arose out of the same incident (*i.e.*, plaintiff blocking the road with his car) – the Court concludes that the existence of probable cause as to Section 1201(a) should preclude a malicious prosecution claim on the disorderly conduct claim. In any event, as discussed *supra*, there was also probable cause for the disorderly conduct charge (or, at a minimum, qualified immunity exists), thus separately warranting summary judgment on that claim.

F.3d at 157 (quoting *People v. Munafo*, 50 N.Y.2d 326, 331 (N.Y. 1980)); *see also Hummel v. City of Carlisle*, 229 F. Supp. 2d 839, 849 (S.D. Ohio 2002) (officer had probable cause to issue citation to motorist for obstructing traffic and disorderly conduct where motorist stopped his car behind police cruiser conducting a traffic stop, exited, and stood in the lane of oncoming traffic while addressing officer). In sum, the undisputed evidence establishes as a matter of law that there was probable cause to prosecute Quinn under § 240.20(5) for recklessly obstructing the roadway.[23] Thus, the malicious prosecution claim asserted by Quinn must be dismissed.

### d. Post-Arraignment Deprivation of Liberty

"In order to allege a cause of action for malicious prosecution under § 1983, [a plaintiff] must assert, in addition to the elements of malicious prosecution under state law, that there was . . . a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (citations omitted). Defendants contend that there was no post-arraignment deprivation of plaintiffs' liberty because they were not incarcerated and no specific restrictions were placed on their ability to travel outside of the state. (Defs.'

---

[23] Even if a jury could conclude that there was no probable cause to prosecute Quinn, it is apparent that police officers of reasonable competence could disagree as to whether Quinn was in violation of the disorderly conduct statute or N.Y. Veh. & Tr. Law § 1201(a), thus establishing arguable probable cause to prosecute him under both statutes. Therefore, this claim is dismissed, in any case, based upon the defense of qualified immunity.

Br., at 11-12.) Plaintiffs, however, claim that the court required them to make multiple court appearances after the arraignment, up to and including the criminal trial. (Defs.' Rev. 56.1, at ¶ 28.) Plaintiffs argue that "the burden and requirement of court appearances and to answer to the state's charges is a deprivation of the Plaintiff's civil liberties." (Pls.' Br., at 10.) The Court finds that, under the facts of this case, plaintiffs have suffered a post-arraignment deprivation of liberty sufficient to implicate their Fourth Amendment rights.

In a concurring opinion in *Albright v. Oliver*, 510 U.S. 266, 280, 279 (1994), Justice Ginsburg suggests that an individual arraigned and released on his own recognizance remained "effectively 'seized' for trial so long as the prosecution against him remained pending":

> A defendant incarcerated until trial no doubt suffers greater burdens. That difference, however, should not lead to the conclusion that a defendant released pretrial is not still "seized" in the constitutionally relevant sense. Such a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed "seized" for trial, so long as he is bound to appear in court and answer the state's charges.

The Second Circuit relied upon Justice Ginsburg's concurrence in *Albright* in *Murphy v. Lynn*, which held that restrictions on interstate travel and the requirement to make court appearances constitute "seizures" under the Fourth Amendment. 118 F.3d at 946. In *Murphy*, in addition to noting the restrictions on plaintiff's travel, the Second Circuit also acknowledged that "[plaintiff] was further

obligated to appear in court in connection with those charges whenever his attendance was required" and that "[h]e indeed was called for court appearances some eight times during the year in which his criminal proceeding was pending." *Murphy*, 118 F.3d at 946. The court concluded that these restrictions constituted a Fourth Amendment seizure. *Id.* ("[W]hile a state has the undoubted authority, in connection with a criminal proceeding, to restrict a properly accused citizen's constitutional right to travel outside of the state as a condition of his pretrial release, and may order him to make periodic court appearances, such conditions are appropriately viewed as seizures within the meaning of the Fourth Amendment.").[24]

Several district courts have relied upon *Murphy*, as well as Justice Ginsburg's concurrence in *Albright*, to conclude that a plaintiff who has been released on his own recognizance without travel restrictions may nevertheless bring a malicious prosecution claim under § 1983. *See, e.g., Kirk v. Metropolitan Transp. Auth.*, 99-CV-3787 (RWS), 2001 U.S. Dist. LEXIS 2786, at *46 (S.D.N.Y. March 19, 2001) ("Although Kirk's ability to travel out of the jurisdiction was not restricted when he was released on his own recognizance, the fact that he was required to appear in court on at least three occasions or face the issuance of a bench warrant rendered him effectively seized because he was 'subjected to restraints not shared by the public generally.'") (quoting *Murphy*, 118 F.3d at 945) (internal citation omitted); *Sassower v. City of White Plains*, 992 F. Supp. 652, 656 (S.D.N.Y. 1998) (explaining that "the *Murphy* court never suggests that it required a combination of the two conditions [restriction on travel and required court appearances] to constitute a 'seizure'" and finding that, where plaintiff was required to appear in court on three occasions and changed her vacation plans, she had raised "a genuine issue of fact as to the deprivation of liberty element" of her § 1983 malicious prosecution claim) (citations omitted); *Willner v. Town of North Hempstead*, 977 F. Supp.

---

[24] Chief Judge Jacobs dissented in *Murphy* and noted:

> Under the majority's analysis, every defendant in a criminal case will be deemed to be seized: at one end of the continuum, a defendant will be in jail, and thus be seized in fact; at the other end, a defendant will be released on recognizance (like Murphy) and be deemed seized anyway by reason of the incidental travel restriction and the obligation to appear in court. (It is undisputed that in New York no person against whom a criminal charge is pending may leave the state without the prior permission of the court.)

118 F.3d at 953. Other circuit courts have refused to adopt, or have questioned, the continuing seizure requirement articulated by Justice Ginsberg in her solitary concurrence in *Albright* and followed by the Second Circuit in *Murphy*. *See, e.g., Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003) (pretrial release conditions requiring plaintiff to make court appearance and imposing pretrial restrictions did not constitute a Fourth Amendment seizure in

malicious prosecution action under Section 1983); *Riley v. Dorton*, 115 F.3d 1159, 1162-64 (4th Cir. 1997) (en banc) (declining to adopt "continuing seizure" concept in excessive force case); *Reed v. City of Chicago*, 77 F.3d 1049, 1052 n.3 (7th Cir. 1996) ("although the concept of 'continuing seizure' is intriguing, we rejected the concept") (internal citations omitted); *Whiting v. Traylor*, 85 F.3d 581, 584 (11th Cir. 1996) (expressing doubts about "continuing seizure," but not reaching the issue).

182, 189 (E.D.N.Y. 1997) (holding that the requirement of plaintiff to attend court appearances as a result of a criminal information constitutes a "seizure" for purposes of a section 1983 claim for malicious prosecution); *Martinez v. Gayson*, 95-CV-3788 (ILG), 1998 U.S. Dist. LEXIS 12281, at *9 (E.D.N.Y. June 30, 1998) ("[B]ecause during his trial Martinez was required to attend court proceedings . . . a post-arraignment deprivation of liberty can be said to have resulted.").

While defendants argue that a plaintiff must be subjected both to court appearances *and* an affirmative order to remain in the state in order to claim that he has suffered a Fourth Amendment seizure, the Court declines to read *Murphy* to require an affirmative order restricting travel, especially in light of the Second Circuit's subsequent holding in *Rohman v. New York City Transit Authority*, 215 F.3d at 215.[25] In *Rohman*, the Second Circuit extended its reasoning in *Murphy* to hold that, where a defendant was required to appear before the Court five times and to remain available for Court appearances, a post-arraignment deprivation of liberty had been proven:

> [I]n our view, Rohman has sufficiently demonstrated the requisite post-arraignment restraint of liberty. Specifically, Rohman alleged that he was required, as a condition of his post-arraignment release, to return to court on at least five occasions before the charges against him were ultimately dropped. In addition, we note that in New York, a criminal defendant released on his own recognizance, as Rohman was, must "render himself at all times amenable to the orders and processes of the court," N.Y. Crim. Proc. Law § 510.40, and therefore must ordinarily remain in the state. We conclude that these alleged limitations on his liberty,

---

[25] Though defendants seek support for their position in *Murphy* and *Dorman v. Castro*, 347 F.3d 409, 411 (2d Cir. 2003), neither case stands for this proposition. In *Murphy*, the Second Circuit asked "whether the order that Murphy not leave the State of New York *or* the requirement that he attend court appointments constituted a 'seizure' within the meaning of the Fourth Amendment" and concluded that "they did," indicating that either condition was sufficient to constitute a post-arraignment deprivation of liberty under § 1983. *Murphy*, 118 F.3d at 945 (emphasis added); *see also id.*, at 955 (Jacobs, J., dissenting) ("Equally strange is the majority's holding that Murphy was seized within the meaning of the Fourth Amendment because he was required to appear in court."). In *Sassower*, the court rejected a reading of *Murphy* that required both conditions to be present in order to establish a Fourth Amendment seizure, declaring

Municipal Defendants misconstrue the *Murphy* decision as requiring both an infringement on a plaintiff's right to travel and required court appearances in order to satisfy the "seizure" element of a Section 1983 malicious prosecution claim. . . . Instead, the Second Circuit made clear that each condition, independent of the other, constitutes a "seizure."

992 F. Supp. at 656 (citing *Murphy*, 118 F.3d at 946). Moreover, *Dorman*, upon which defendants also rely, is inapposite. *Dorman* merely declines to apply *Murphy* to a case involving a *pre*-arraignment summons, and does not speak to the issue of whether limitations on travel are required in order to establish a Fourth Amendment seizure post-arraignment. *Dorman*, 347 F.3d at 411.

which as pleaded go beyond the fact of the arraignment itself, are enough, at least at the pleading stage, to implicate the Fourth Amendment.

*Rohman*, 215 F.3d at 216 (citing *Murphy*, 118 F.3d at 945-46). Thus, in *Rohman*, the Second Circuit made clear that, even where there was no explicit order restricting out-of-state travel, appearing in court on five occasions, combined with the requirement to be amenable to orders of the court, in essence requires a defendant to "ordinarily" remain in the state, and, therefore, such conditions are sufficient to constitute a deprivation of liberty under the Fourth Amendment. The Court finds that the facts of the instant case, where plaintiffs were required to attend a four-day trial and were subject to the provisions of N.Y. Crim. Proc. Law § 510.40, to be nearly identical to those in *Rohman*.[26] As *Murphy* and *Rohman* are binding precedent upon this Court, the Court finds that plaintiffs have alleged a sufficient deprivation of liberty to establish a malicious prosecution claim under § 1983 despite the absence of specific travel restrictions.

e. Other Elements of Malicious Prosecution

As to the remaining elements of a malicious prosecution claim, plaintiffs have demonstrated (1) commencement of criminal proceedings and (2) termination of criminal proceedings in their favor. It is undisputed that defendants Summerlin and Liberti commenced criminal proceedings against Genia and Wright, respectively, by signing criminal informations against them and having them arraigned before a town justice.[27] N.Y. Crim. Proc. Law § 100.05 ("[A] criminal action can be commenced only in a local criminal court, by the filing therewith of a local criminal court accusatory instrument, namely: . . . [a]n information."); *Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994) (finding commencement of criminal proceedings where state troopers formally charged plaintiff with violating a statute and had him arraigned before the town justice) (citation omitted). Second, the criminal proceedings ended in Genia and Wright's favor when the charges against them were dismissed following a jury trial. (Brewington Decl., Ex. A.)

The fourth element of a malicious prosecution claim, actual malice, may be satisfied by a lack of probable cause:

> [L]ack of probable cause to institute a criminal proceeding and proof of actual malice are independent and indispensable elements of a malicious prosecution action, the absence of probable cause does bear on the malice issue. . . . A jury may infer the existence of actual malice from the absence of probable cause.

---

[26] In fact, Wright asserts in his deposition testimony that he and the other plaintiffs were required to make at least four additional court appearances between the arraignment and the start of the criminal trial. (Brewington Decl., Ex. G.)

[27] As no evidence has been shown that Trooper Lewis participated in the commencement of criminal proceedings against Wright, summary judgment is granted as to any malicious prosecution claim against him. Similarly, as there is no evidence of Trooper Liberti's involvement in commencing criminal proceedings against Genia (other than acting as a courier for the charging instrument that was signed by Trooper Summerlin), summary judgment is granted as to any malicious prosecution claim against him.

*Maxwell v. New York*, 554 N.Y.S.2d 502, 505 (N.Y. App. Div. 1990) (citing *Martin v. City of Albany*, 396 N.Y.S.2d 612, 614-15 (N.Y. 1977) (holding that actual malice is typically shown by circumstantial evidence, including a lack of probable cause)); *Rounseville*, 13 F.3d at 631 (noting that under New York law, actual malice and lack of probable cause are closely related); *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) ("In most cases, the lack of probable cause – while not dispositive – tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.") (citation and internal quotation marks omitted); *Mesiti v. Wegman*, 763 N.Y.S.2d 67, 70 (N.Y. App. Div. 2003) ("[T]he jury was able to 'infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding.'") (quoting *Martin*, 396 N.Y.S.2d at 615). In this instance, where the Court has found that there is a disputed issue of fact regarding whether there was probable cause to prosecute Genia and Wright, there is also sufficient evidence to create an issue of fact as to whether there was "actual malice."

### 3. Qualified Immunity as to False Arrest and Malicious Prosecution Claims

An arresting officer is entitled to qualified immunity on a claim of false arrest or malicious prosecution if either: "(a) it was objectively reasonable for the officer to believe that probable cause existed; or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *O'Neill*, 986 F.2d at 649-50 (quotation marks and citation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 424-25 (2d Cir. 1995). "The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established

constitutional right." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).

It is well-settled that "the issue of the reasonableness of an arrest or a search for purposes of a Fourth Amendment inquiry is distinct from the issue of objective reasonableness for purposes of a qualified immunity inquiry." *Provost*, 262 F.3d at 168 n.5 (citing *Anderson*, 483 U.S. at 641 ("It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that [the] search was objectively legally unreasonable.")) (additional citation omitted). The Supreme Court has held in *Anderson* that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable." 483 U.S. at 641.

This standard, often referred to as "arguable probable cause," has been defined by the Second Circuit as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law.

*Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001) (quotation marks and citations omitted). Furthermore, "an 'arresting officer is entitled to qualified immunity as a matter of law if the undisputed facts and all permissible

inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met.'" *McClellan v. Smith*, 439 F.3d 137, 147-48 (2d Cir. 2006) (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)).

As discussed *supra*, with regard to the false arrest and malicious prosecution claims, viewing the evidence in the light most favorable to plaintiffs, Genia and Wright have created material issues of fact as to (1) whether they were standing on the construction site before their arrest; and (2) whether they were blocking the bulldozer's access to the site. If plaintiffs can establish at trial that they were neither on the property or blocking access to it, then Troopers Summerlin and Lewis would not have had arguable probable cause to arrest or to prosecute them for trespassing or for disorderly conduct. Likewise, Genia and Wright have set forth evidence indicating that they did not resist arrest in any way, and if their accounts are believed by a jury, then the troopers would not have had arguable probable cause to prosecute them on these charges.[28] Accordingly, defendants are not

entitled to qualified immunity on these claims at this stage.

4. Excessive Force

A police officer's application of force is excessive in violation of the Fourth Amendment, "if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'"[29] *Maxwell*,

---

[28] Inasmuch as plaintiffs' claims of false arrest and/or malicious prosecution are premised upon their purported ownership of the land or their right to halt construction based upon a pending stay application in state court, this Court finds that it would have been objectively reasonable for the troopers to arrest and prosecute plaintiffs for trespassing or disorderly conduct if they were standing upon the land or blocking access to it. At the time of the arrests, the developers were in current control of the property, as demonstrated by the construction taking place. In the absence of any showing that the protestors had a right to halt the construction, the troopers could reasonably believe that it was lawful for them to arrest plaintiffs if they did not confine their

demonstration to a public area that did not block access to the site. In fact, at oral argument, counsel for plaintiffs conceded that, if plaintiffs were on the private land and/or were blocking the bulldozer, the disputed issue of land ownership would not have precluded a lawful arrest by the police.

[29] Plaintiffs contend that "[w]here there has been an unlawful arrest, any degree of force is unreasonable and excessive." (Pls. Br., at 12) (citing *Atkins v. New York City*, 143 F.3d 100, 103 (2d Cir. 1998)). However, the Second Circuit recently clarified the "undue confusion" engendered by its decision in *Atkins*, explaining that

> The *Atkins* court clearly did not intend to create or substitute a new standard for arrests lacking probable cause, and the reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest.

*Papineau v. Parmley*, 465 F.3d 46, 62 (2d Cir. 2006). Following the guidance of the Second Circuit, this Court declines to view defendants' application of force to be *per se* excessive and unreasonable based solely upon the existence of questions of fact regarding probable cause as to the underlying arrests.

380 F.3d at 108 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). More specifically, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citations and quotation marks omitted). Clearly, physical force is often necessary when effectuating arrests or executing search warrants; thus, "[n]ot every push or shove" is unconstitutionally excessive, "even if it may later seem unnecessary in the peace of a judge's chambers." *Id.* (citation omitted). The analysis involves an inquiry into the totality of the circumstances, "including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000) (citations omitted).

Moreover, if a police officer does not personally use excessive force, but witnesses the use of excessive force by other officers, that witnessing officer may be liable for failing to intercede to prevent the constitutional violations of other officers where the officer had reason to know such force was being used and had a realistic opportunity to intercede. *See Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be."); *accord O'Neill*, 839 F.2d at 11-12.

Defendants contend that any force used was justified under the circumstances, particularly in the cases of plaintiffs Genia and Wright, who allegedly resisted arrest.

Alternatively, defendants argue that any force employed was "minimal." (Defs.' Br., at 14.)

a. Excessive Force as to Genia

Genia testified at her deposition that Trooper Summerlin "grabb[ed]" her neck and shoulders, "put his knee in [her] stomach," and "pushed her from behind" so that she was "jerked almost off [her] feet." (Brewington Decl., Ex. F.) According to Genia, Trooper Summerlin "'shoved' her and – with Trooper Liberti and Sgt. Schultz – brought her to a car," and "'slammed' her onto the hood of the car." (*Id.*) Genia alleges further that, while Troopers Summerlin and Liberti escorted her to the trooper car, Trooper Liberti "twisted [her] handcuffs, wrenched [her] wrists and jabbed them into [her] back," causing Genia to turn around and say "stop, you are hurting me." (*Id.*)

While the video of Genia's arrest is inconclusive as to whether excessive force was used, several defense witnesses at Genia's criminal trial described the manner in which Troopers Summerlin and Liberti arrested Genia. (Brewington Decl., Ex. O.) Reverend Davis testified that Trooper Summerlin "threw" Genia face down on the car. (Brewington Decl., Ex. N.) Valdez stated that he saw Summerlin "grab[] [Genia], he had the back of her arm . . . he had [Genia's] arm and was lifting her body weight by her arm." (*Id.*) According to Valdez, two troopers then "hit" Genia's head "on the hood" of a car and carried Genia by her arms and hands before putting her into a police vehicle:

I mean they were holding her up in the air by her shoulder and her arms together with the handcuffs. I would say by the handcuff if you really

pressed me for it, because I am pretty sure that is what he was doing. He had a hold of that handcuff in between the two hand, which I can't imagine how much that hurt. I have actually never discussed it with her about pain, but it hurt.

(*Id.*) Similarly, Haile, who also witnessed the arrest, stated that "after the policemen would not stop arresting her, hurting her arms . . . then she was pushed into a car, and I went to the window and looked into the window to see what condition she was in, and she was kind of twisted up in the backseat. And she kept saying her wrists hurt." (*Id.*) Harriet Gumbs testified that "I saw him pull [Genia's] arm back, I thought they was going to try to break it off, and she was in a great deal of pain, she was screaming." (*Id.*)

Following the incident, Genia sought treatment from an acupuncturist for wrist and back pain. (*Id.*) She did not obtain any other medical treatment for her injuries. According to defendants, the force used against Genia was reasonable because she was resisting arrest. Defendants also contend that, as Genia was not hospitalized and sought no medical treatment other than acupuncture, any injuries that she sustained were minimal, and are therefore insufficient to sustain an excessive force claim.

However, viewing the record in plaintiff's favor, this Court cannot find, as a matter of law, that Genia's excessive force claim should be dismissed on summary judgment. First, there is a material question of fact as to whether Genia was resisting arrest. By her own account, set forth *supra*, Genia did

absolutely nothing to resist arrest.[30] Second, there is a material question of fact as to the extent of Genia's injuries. Given the allegations of force in this case, the Court declines to find, because plaintiff's medical treatment was limited to acupuncture, rather than more traditional forms of medical treatment, that her injuries were not of a serious nature. Moreover, even if Genia's injuries were "minimal," while "the extent of a plaintiff's injuries is relevant, a plaintiff need not sustain serious injury to maintain a claim that the use of force was objectively unreasonable under the Fourth Amendment." *Ostroski*, 443 F. Supp. 2d at 343 (citing *Maxwell*, 380 F.3d at 108 ("[W]e have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising.") (citing *Robison*, 821 F.2d at 924-25)); *Robison*, 821 F.2d at 924 ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe.") (citations omitted). "Although a jury may consider the lack of serious injury as evidence that the implemented force was not excessive, and may weigh it against the testimony of plaintiff

_____

[30] Even if defendants' account of the events is true, the fact that plaintiff may have resisted arrest, standing alone, does not necessarily entitle them to judgment as a matter of law because any implemented force must be reasonably related to the level of resistance. *Sullivan*, 225 F.3d at 166 ("The force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer."). In fact, a plaintiff may sustain a claim for excessive force under § 1983 despite being convicted for resisting arrest or assault. *See id.*

. . . it does not entitle defendants to judgment as a matter of law because the Court must view the evidence in the light most favorable to plaintiff." *Id.* (citing *Pierre-Antoine v. City of New York*, 04-CV-6987 (GEL), 2006 WL 1292076, at *5 (S.D.N.Y. May 9, 2006) (noting that although the lack of severe injury may be considered by a jury as evidence that force was not excessive, it did not entitle defendants to judgment as a matter of law)).

b. Excessive Force as to Wright

At trial, Wright testified that his arms were "grabbed," and that he "was pushed towards the trooper's car and pushed onto the side of the front of the car," where both Trooper Lewis and Trooper Liberti placed handcuffs on him. (Brewington Decl., Ex. G.) According to Wright, the handcuffs on his wrists "were a little tight," but he did not complain at all to the troopers about the tightness of the cuffs.[31]  (*Id.*)

(i) Pushing

This Court finds that Wright's claim of excessive force on the basis that he was "pushed" incident to his arrest is without merit. There is no evidence in the record that Wright ever complained to the arresting officers of pain or discomfort caused by pushing, he does not allege any specific injuries as a result of pushing, and he never sought medical attention as a result of the force used against him. Therefore, as a matter of law, the alleged "push" cannot constitute

unreasonable excessive force in violation of the Fourth Amendment. "Indeed, to conclude that a 'push' that does not cause the slightest of physical injuries to the plaintiff is nonetheless an actionable use of excessive force would be to hold that any physical contact by an arresting officer with the arrested person is actionable." *Roundtree v. City of New York*, 778 F. Supp. 614, 622 (E.D.N.Y. 1991); *Bowles v. State*, 37 F. Supp. 2d 608, 612 (S.D.N.Y. 1999) (declining to find unreasonable excessive force where plaintiff was "push[ed] and shov[ed]" during a search incident to his arrest); *Mandina v. City of Yonkers*, 97-CV-1087 (LAP), 1998 WL 637471, at *9 (S.D.N.Y. Sept. 16, 1998) (granting summary judgment against *pro se* plaintiff who alleged that defendant officers used excessive force by pushing and shoving him into a police car).

(ii) Handcuffing

"Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005) (citing *Cavazos v. Voorhies*, 00-C-7929, 2002 WL 31017492, at *3 (N.D. Ill. Sept. 9, 2002)). "While it is not *per se* reasonable under the *Graham* standard to apply handcuffs during an arrest . . . 'there is still no clear authority on whether and under what circumstances, if any, a person has a constitutional right not to be handcuffed in the course of an arrest.'" *Scott v. County of Nassau*, No. 94 CV 4291, 1998 U.S. Dist. LEXIS 19680, at *14 (E.D.N.Y. Dec. 11, 1998) (quoting *Soares v. State of Connecticut*, 8 F.3d 917, 921-22 (2d Cir. 1993)). To determine whether handcuffing of an arrestee is reasonable, the handcuffing must be viewed "in light of the minimal amount of force

---

[31] Although plaintiffs averred at oral argument that the troopers had employed additional force against Wright, Wright did not assert in his deposition or trial testimony that any force beyond "pushing" and tight handcuffs was used, nor does the videotape indicate any other possible type of force.

necessary to maintain custody of [the arrestee]." *Esmont*, 371 F. Supp. 2d at 215. "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Id.* (citing *Burchett v. Kiefer*, 310 F.3d 937, 944-45 (6th Cir. 2002)) (additional citation omitted).

In this instance, where (1) Wright's handcuff's were allegedly only "a little" rather than "unreasonably tight," (2) Wright did not request that the handcuffs be loosened or indicate to the troopers that they were causing him pain, and (3) Wright has presented no medical evidence indicating that he suffered any injury as a result of the handcuffing, this Court concludes, as a matter of law, that Troopers Lewis and Liberti's handcuffing of Wright cannot constitute excessive force. In *Esmont*, the court noted that there were no cases "permitting a plaintiff to establish an excessive force claim based on tight handcuffing in the absence of a request to loosen them." *Id.* (collecting cases); *Scott*, 1998 U.S. Dist. LEXIS 19680, at *14 ("Without additional allegations of excessive force or blatant disregard for pre-existing injuries, complaints, or requests for medical treatment, the use of handcuffs has been found to be reasonable.") (collecting cases); *Gilles v. Davis*, 427 F.3d 197, 207-08 (3d Cir. 2005) (holding that where plaintiff did not complain about pain caused by handcuffs or demonstrate any signs of discomfort and did not seek medical attention, "the facts alleged constitute insufficient evidence as a matter of law for excessive force by handcuffing").

c. Excessive Force as to Quinn

Although defendants dispute that excessive force was used against Quinn, Quinn testified in his deposition that Trooper Parker "grabbed [his] arms and put the cuffs on" when he was arrested, then "yanked" him off of the ground and put him in the police car:

> Q: Were you then escorted to a car?
> A: Yes, I was yanked up off the ground and put in the car.
> Q: Who did that?
> A: Sergeant Parker or Trooper Parker.
> Q: Did you say anything to him between the time that he put the cuffs on until he put you in the car?
> A: Yes, I said I wasn't resisting arrest or anything, what is he trying, why was he trying to hurt me and stuff like that by yanking me up by the cuffs and stuff.
> Q: Did he respond to that statement of yours?
> A: I don't recall.

(Brewington Decl., Ex. H.) At trial, Quinn further elaborated:

> A: . . . Then they tried to, when they was handcuffing me, Parker was trying to just get my arms up, trying to get me to resist, trying to pull my arm up to the back of my neck, and I just kept looking at him and saying, do you have a problem, he kept just, you know, trying to lift me off the ground.
> Q: How did that feel?
> A: It was hurting.

(Brewington Decl., Ex. N.) Trooper Parker acknowledged in his trial testimony that Quinn did not resist arrest. (*Id.*) Because

Quinn and the other troopers were surrounded by people as soon as Quinn was placed under arrest, the videotape of the incident is inconclusive as to whether Quinn resisted and whether the force used against him was excessive. (Brewington Decl., Ex. O.)

Following the incident, Quinn visited the Shinnecock Health Service, which referred him to University Hospital at Stony Brook, as well as an acupuncturist. (Defs.' Rev. 56.1, at ¶ 86.) According to Quinn, he suffered nerve damage injuries in both wrists and hands, and problems with his right shoulder, which he described as "[j]ust like it was dislocated or something like bruised, just muscle soreness and stuff." (Brewington Decl., Ex. H.) Plaintiffs concede that Quinn's nerve damage may have been caused by Quinn's pre-existing carpal tunnel syndrome. (Defs.' 56.1, at ¶¶ 87, 88.) Prior to February 24, 2000, Quinn had also experienced numbness and shoulder pain. (Defs.' Rev. 56.1 at ¶ 88.)

Viewing the evidence most favorably to Quinn, this Court concludes that a reasonable jury could find that Trooper Parker exercised excessive force in arresting Quinn and/or that Trooper Gasparik should have intervened to stop the use of excessive force. *See, e.g., Warren v. Williams*, No. 04-CV-537 (JCH), 2006 WL 860998, at *40 (D. Conn. Mar. 31, 2006) (declining to grant summary judgment on excessive force claim where plaintiff's arms were"'yanked repeatedly' behind her back," causing serious injury and pain). At this stage, there are material questions of fact as to whether Quinn's alleged injuries are beyond "minimal" and whether such injuries were directly caused by his arrest. *See Maxwell*, 380 F.3d at 108 *Robison*, 821 F.2d at 924-25; *Pierre-Antoine*, 2006 WL 1292076, at *5.

d. Qualified Immunity as to Excessive Force Claims

Defendants argue that, even if Troopers Summerlin, Liberti and Parker's use of force (and/or Trooper Gasparik's failure to intervene) violated the Fourth Amendment, they are nevertheless entitled to qualified immunity. However, the Court rejects this assertion. Viewing the evidence in a light most favorable to plaintiffs, if they did not resist arrest in any way, as they claim, a reasonable officer should have known that either pushing and slamming Genia into a car, jerking her by her arms and twisting her handcuffs despite her cries of pain, or yanking Quinn's arms despite his protests, and with enough force to cause injury violates a clearly established constitutional right not to be subjected to excessive force during arrest. *See, e.g., Johnson v. City of New York*, No. 05-CV-2357 (SHS), 2006 U.S. Dist. LEXIS 56704, at *15 (S.D.N.Y. August 14, 2006) ("[I]t could not be objectively reasonable for [the officer] to have believed that the use of gratuitous force beyond what is necessary to subdue an individual during a search is allowed under the law.") (citations omitted). If the jury credits Genia and Quinn's accounts, then this case involves the violation of a clearly established right for which qualified immunity is unavailable, rather than "the hazy border between excessive and acceptable force," *Saucier*, 533 U.S. at 206.

5. First Amendment Claims

Plaintiffs argue that defendants arrested and prosecuted them in retaliation for the exercise of their First Amendment rights in protesting development of the contested land. "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected

right,' and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 126 S. Ct. 1695, 1701 (2006) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)) (additional citation omitted). Generally, in order to establish a First Amendment retaliation claim under § 1983, a plaintiff must prove that "(1) he has an interest protected by the First Amendment; (2) defendant's actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley*, 268 F.3d at 73 (citing *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998)). In cases such as this, however, where the claim is official retaliation in response to a private individual's speech, and where there is an alleged lack of probable cause for the official actions, plaintiffs "must show that [their] activity was protected by the First Amendment and that the defendant's conduct complained of was in response to that protected activity." *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 418 (2d Cir. 1999) (Calabresi, J.) (citing *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994)). As the Supreme Court recently stated, "when nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution." *Hartman*, 126 S. Ct. at 1701.

Defendants contend that plaintiffs have not established either the intent or chilling elements of a First Amendment retaliation claim.[32] However, some courts have found, since *Hartman*, that if a plaintiff demonstrates a lack of probable cause, there is no separate chilling requirement in a retaliatory prosecution action. *See, e.g., Bradley v. City of New York*, No. 04-CV-8411 (RWS) (MHD), 2007 U.S. Dist. LEXIS 7811, at *21-22 (S.D.N.Y. Jan. 26, 2007) ("Plaintiff must

---

[32] Defendants also argue that "plaintiffs' First Amendment rights could be perceived by a reasonable police officer or trooper as not encompassing a demonstrator's right to intentionally block construction vehicles, or to ignore an officer's directions to stop obstructing them." (Defs.' Br., at 21) (citing *Bachellar v. Maryland*, 397 U.S. 564 (1970) and *Adderley v. Florida*, 385 U.S. 39 (1966)). In fact, neither *Bachellar*, in which the Supreme Court reversed petitioners' convictions where it could not determine whether the convictions were based upon a finding that petitioners had actually violated the law or upon the jurors' objections to their political beliefs, nor *Adderley*, in which the Supreme Court upheld the trespassing convictions of civil rights demonstrators, have any bearing on this case. 397 U.S. at 570 ("Thus, on this record, we find that petitioners may have been found guilty of violating § 123 simply because they advocated unpopular ideas. Since conviction on this ground would violate the Constitution, it is our duty to set aside petitioners' convictions."); 385 U.S. at 47 ("Nothing in the Constitution of the United States prevents Florida from even-handed enforcement of its general trespass statute against those refusing to obey the sheriff's order to remove themselves from what amounted to the curtilage of the jailhouse."). Defendants are correct that if probable cause existed to arrest plaintiffs for any crime, including disorderly conduct, plaintiffs are barred from asserting valid First Amendment claims. *Hartman*, 126 S. Ct. at 1707. However, because the Court finds that there are material questions of fact as to whether the troopers had probable cause to arrest Genia and Wright, *see supra*, their First Amendment claims cannot be dismissed on this basis, *see infra*.

demonstrate that the prosecution was not supported by probable cause, but need not show a chilling effect") (citing *Hartman*, 126 S. Ct. at 1695) (additional citation omitted). Thus, where defendants have not established probable cause for the arrest, plaintiffs need not establish that their free speech rights were "actually chilled" by defendants' actions in order for their claims to survive summary judgment. In any case, this Court finds, *see infra*, that Genia and Wright have set forth evidence of "actual chilling" sufficient to survive summary judgment.

### a. Genia's First Amendment Claim

#### (i) Intent

This Circuit has held that "[s]pecific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." *Curley*, 268 F.3d at 73 (citing *Blue v. Koren*, 72 F.3d 1075, 1082-83 (2d Cir. 1995) (requiring plaintiff to provide "specific allegations or direct evidence of the required state of mind in order to avoid summary judgment based on the defense of qualified immunity")). Specifically, "the plaintiff must proffer particularized evidence of direct or circumstantial facts . . . supporting the claim of an improper motive in order to avoid summary judgment." *Blue*, 72 F.3d at 1084 (citing *Siegert v. Gilley*, 500 U.S. 226, 236 (1991) (Kennedy, J., concurring)).

With regard to the actions against Genia, plaintiffs contend that Trooper Summerlin clearly intended to prevent her from exercising her right to protest. At Genia's deposition, she testified that Trooper Summerlin's goal was to silence the demonstrators:

The first thing I remember Trooper Summerlin saying was we are not taking your s*** today. We are going to kick your a****. He said that several times. Go home, he kept saying go home. You are trespassing, I remember that comment.

(Brewington Decl., Ex. F). Wright corroborated this account, stating that "as soon as he got out of his trooper car, the first things [Trooper Summerlin] said to us was we are not taking your s*** this time and you guys are going to be arrested." (Brewington Decl., Ex. G.) Genia also recalled Trooper Summerlin "asking the foreman did you tell them to leave and the foreman said no. He said, well, you have to tell them to leave if you want me to arrest them." (*Id.*)

Defendants argue, first, that since Trooper Summerlin's statements were allegedly made "in the context of warning [Genia] that the demonstrators were trespassing," they do not "constitute evidence of any improper intent on Summerlin's part." (Defs.' Br., at 16.) The Court disagrees. As the Second Circuit has stated, "the particularized evidence of improper motive may include expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken." *Blue*, 72 F.3d at 1084. Genia's statements, if credited, indicate that well before warning the demonstrators that they were engaging in any crime ("[a]s soon as he got out of his trooper car"), Trooper Summerlin clearly stated an intent to silence the protestors. Moreover, by ordering the protestors to "go home," a jury could find that Trooper Summerlin's intent was not merely to confine the Shinnecock demonstrators to a public area, thereby

preventing trespass, but was perhaps to disperse the demonstration altogether. The Court finds, therefore, that Genia has set forth particularized evidence from which a jury could find Trooper Summerlin's unconstitutional subjective intent in arresting and prosecuting her. *See, e.g., Kerman v. City of New York*, 261 F.3d 229, 242 (2d Cir. 2001) (denying summary judgment where defendant allegedly told plaintiff that he would "teach [plaintiff] a lesson" and "give [him] something to sue for").

Second, defendants contend that Trooper Summerlin had probable cause to arrest Genia, and therefore she cannot maintain a valid claim of retaliatory arrest in violation of the First Amendment. The Second Circuit has held that "the existence of probable cause provides qualified immunity to the officer . . . from a claim that the arrest was for an improper purpose." *Blue*, 72 F.3d at 1083 n.5 (citing *Magnotti v. Kuntz*, 918 F.2d 364 (2d Cir. 1990) (qualified immunity shields an officer from a retaliation claim where a reasonable officer could believe that the warrant at issue was supported by probable cause) and *Mozzochi v. Borden*, 959 F.2d 1174 (2d Cir. 1992) (qualified immunity shields an officer from a retaliation claim where a reasonable officer could believe that the arrest and prosecution at issue were supported by probable cause)). Similarly, the Supreme Court's decision in *Hartman* compels the conclusion that a finding of probable cause bars any retaliatory prosecution claim. *Hartman*, 126 S. Ct. at 1707 (holding that, in cases of retaliatory prosecution, probable cause "must be pleaded and proven" by the plaintiff). However, as this Court finds that material questions of fact remain as to arguable probable cause regarding Genia's arrest and prosecution, her claim of First Amendment retaliation cannot

be dismissed on these grounds. *See e.g., Davis*, 373 F. Supp. 2d at 337 (holding that "absent probable cause, the Court cannot decide as a matter of law that defendants' treatment of plaintiffs was not caused by plaintiffs exercise of their First Amendment rights").

(ii) Chilling Effect Upon Speech

Defendants also contend that, because Genia has continued to participate in subsequent Native American demonstrations, her speech has not been chilled and therefore any First Amendment claim must fail. (Defs.' Br., at 16; Defs.' 56.1, at ¶ 63.) As explained *supra*, the viability of the chilling requirement is unclear since *Hartman*, and because this Court finds that there are material questions of fact as to whether there was probable cause to arrest and prosecute Genia, she may not need to prove chilling.[33] However, even if required, plaintiffs have set forth sufficient evidence of actual chilling to survive summary judgment.

Under the chilling requirement, a "plaintiff must show . . . that his First Amendment rights were 'actually chilled.'" *Curley*, 268 F.3d at 73 (quoting *Davis v. Vill. Park II Realty Co.*, 578 F.2d 461, 464 (2d Cir. 1978)). "Where a party can show no change in his behavior, he has quite plainly shown no

---

[33] Even prior to *Hartman*, cases in this Circuit have held that, where, as here, the claim is official retaliation in response to a private individual's speech, there is no chilling requirement. Rather, the applicable standard is that a plaintiff "initially [must] show that [his] conduct was protected by the first amendment, and that defendants' conduct was motivated by or substantially caused by his exercise of free speech." *Gagliardi*, 18 F.3d at 194 (quotation marks and citations omitted).

chilling of his First Amendment right to free speech." *Id.* (finding no chilling effect where plaintiff ran for office following arrest) (citing *Singer*, 63 F.3d at 120 (finding no chilling effect where plaintiff continued to publish newspaper critical of village government), and *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) (finding no chilling effect where plaintiff continued to write critical editorials)). Moreover, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1 (1972)).

In this case, there is a material issue of fact as to whether Genia's First Amendment rights were chilled. Although Genia participated in subsequent demonstrations, her ability to exercise her First Amendment rights the particular day of the protest were obviously impaired when she was arrested, detained and arraigned on criminal charges, because she could no longer participate in the protest that morning. A jury could find that her inability to protest that day was sufficient to constitute "actual chilling." At least one district court in this Circuit has held that, where a plaintiff continued to engage in advocacy activities following his arrest, the officers' actions nevertheless "had an immediate and specific chilling effect on plaintiff in that upon arrest he was unable to continue his demonstration and his First Amendment activities were cut short."[34] *Lederman v. Adams*, 45 F. Supp. 2d 259, 269 (S.D.N.Y. 1999), *aff'd*, 216 F.3d 1072 (2d Cir. 2000); *see also Kerman*, 261 F.3d at 242 ("[A]n involuntary overnight trip to Bellevue

has an obvious chilling effect."); *Jackson v. New York State*, 381 F. Supp. 2d 80, 90 (N.D.N.Y. 2005) (requirement of a chilling effect inappropriate where plaintiff was arrested eleven times, none of which led to conviction, and was involuntarily transported for psychological evaluations).

Therefore, because this Court finds that (1) Genia has raised issues of fact regarding the elements of a First Amendment retaliation claim, and (2) dismissal of the claim on the basis of qualified immunity is not appropriate, the Court denies summary judgment as to this claim.

b. Wright's First Amendment Claim

In support of their claim that Trooper Lewis infringed upon Wright's First Amendment rights, plaintiffs allege that Trooper Lewis arrested Wright without probable cause, within minutes of arriving at the demonstration site. (Pls.' Br., at 20.) They make no specific allegations regarding Trooper Lewis' state of mind, though the record indicates that he was at least aware of plaintiffs' First Amendment activity. At trial, Trooper Lewis testified that he had been told that "the Shinnecock Indians were planning a protest against a development." (Brewington Decl., Ex. N.) In his deposition testimony, Trooper Lewis explained that he had received orders "[t]o insure that the construction vehicles were able to pass onto the site." (Brewington Decl., Ex. L.) Upon arriving at the site, Trooper Lewis spoke with some of the demonstrators, and he testified that "the gist of the conversation was that there was no problem with a peaceful protest as long as access to the construction site wasn't blocked." (Brewington Decl., Ex. N.) According to Trooper Lewis, he did not witness Trooper Summerlin's conversations

---

[34] This analysis of the chilling requirement applies with equal force to Wright's First Amendment claim.

with Genia, and there is no evidence that he concurred with Trooper Summerlin's statements, set forth *supra*. (*See* Brewington Decl., Ex. N.)

Under the standard set forth in *Curley* and *Blue*, plaintiffs must allege "specific proof" of improper motivation in order for their claim to survive summary judgment where a defendant claims qualified immunity. *Curley*, 268 F.3d at 73; *Blue*, 72 F.3d at 1082-84. While plaintiffs do not offer any specific statements allegedly made by Trooper Lewis from which this Court might infer improper motive, in the context of all of the events at the site that morning, the circumstances of Wright's arrest are such that a reasonable jury could conclude that he was targeted on the basis of his speech.[35] *See, e.g., Davis*, 373 F. Supp. 2d at 337, 338 (denying summary judgment where officers claimed qualified immunity, on the basis that material questions of fact remained as to defendants' states of mind in arresting and prosecuting demonstrators). Therefore, summary judgment on this claim is denied.

## c. Quinn's First Amendment Claim

Quinn has conceded that he did not participate in the demonstration. At his deposition, Quinn testified "I wasn't in the protest" and acknowledged that he "just happened to wind up there." (Brewington Decl., Ex. H.) Even if Quinn were able to articulate a protected First Amendment interest, because probable cause existed for Quinn's arrest and prosecution, he cannot set forth a valid First Amendment retaliation claim. *Hartman*, 126 S. Ct. at 1699 (holding that in order to claim First Amendment retaliation, "want of probable cause must be alleged and proven"); *Mozzochi*, 959 F.2d at 1180 ("An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause that is in reality an unsuccessful attempt to deter or silence criticism of the government."). Therefore, summary judgment is granted as to any such claim.

## III. Conclusion

For the reasons stated above, defendants' motion for summary judgment as to the claims of plaintiff Genia for false arrest is DENIED as to Troopers Summerlin and Liberti. Defendants' motion for summary judgment as to plaintiff Genia's claim of malicious prosecution is DENIED as to Trooper Summerlin, and GRANTED as to Trooper Liberti. Defendants' motion for summary judgment as to plaintiff Genia's claim of excessive force is DENIED as to Troopers Summerlin and Liberti. Defendants' motion for summary judgment as to plaintiff Genia's First Amendment claim is DENIED as to Troopers Summerlin and Liberti.

For the reasons stated above, defendants' motion for summary judgment as to the claims of plaintiff Wright for false arrest is DENIED as to Troopers Lewis and Liberti. Defendants' motion for summary judgment as to plaintiff Wright's claim of malicious prosecution is DENIED as to Trooper Liberti, and GRANTED as to Trooper Lewis. Defendants' motion for summary judgment as

---

[35] Similarly, no evidence has been presented that Trooper Liberti, who assisted in the arrests of both Genia and Wright, was aware of or concurred with Trooper Summerlin's statements. However, as in the case of Lewis, in the context of all of the events that took place at the demonstration site, the circumstances of both arrests are such that a reasonable jury could find, if plaintiffs' version is credited, that Trooper Liberti had an improper motive.

to plaintiff Wright's claim of excessive force is GRANTED as to Troopers Lewis and Liberti. Defendants' motion for summary judgment as to plaintiff Wright's First Amendment claim is DENIED as to Troopers Lewis and Liberti.

For the reasons stated above, defendants' motion for summary judgment as to the claims of plaintiff Quinn for false arrest is GRANTED as to Troopers Parker and Gasparik. Defendants' motion for summary judgment as to plaintiff Quinn's claim of malicious prosecution is GRANTED as to Troopers Parker and Gasparik. Defendants' motion for summary judgment as to plaintiff Quinn's claim of excessive force is DENIED as to Troopers Parker and Gasparik. Defendants' motion for summary judgment as to plaintiff Quinn's First Amendment claim is GRANTED as to Troopers Parker and Gasparik.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 20, 2007
Central Islip, New York

* * *

The attorney for plaintiffs is Frederick K. Brewington, Esq., Law Offices of Frederick K. Brewington, 50 Clinton Street, Suite 501, Hempstead, New York 11550. The attorney for defendants is Ralph Pernick, Esq., New York State Attorney General's Office, 200 Old County Road, Suite 460, Mineola, New York 11545-1403.